1

2

3

4          IN THE UNITED STATES DISTRICT COURT

5        FOR THE EASTERN DISTRICT OF CALIFORNIA

6

7  UNITED STATES OF AMERICA,        )  CASE NO. 1:08-cr-00224 OWW
                                    )
8                    Plaintiff,     )  ORDER RE: DEFENDANT ERMOIAN'S
                                    )  MOTION FOR JUDGMENT OF
9  v.                               )  ACQUITTAL AND MOTION FOR NEW
                                    )  TRIAL
10 GARY L. ERMOIAN,                 )
                                    )
11                   Defendant.     )
                                    )
12 _____ )

13

14      This matter came on for hearing on February 28, 2011.  Defendant

15 Gary L. Ermoian moved the court for a Judgment for Acquittal or, in

16 the alternative, for a New Trial.  For the following reasons,

17 defendant's motions are hereby DENIED.

18      The defendant was convicted at trial by jury on August 13, 2010

19 of one count of Conspiracy to Obstruct Justice, in violation of Title

20 18, United States Code, sections 1512(c)(2) and (k).

21                              I.

22              MOTION FOR JUDGMENT OF ACQUITTAL

23      The standard to be applied in reviewing the sufficiency of

24 evidence in a Motion for Judgement of Acquittal pursuant to Federal

25 Rule of Criminal Procedure Rule 29 is whether "after viewing the

26 evidence in the light most favorable to the government, _any_ rational

27 trier of fact could have found the essential elements of the crime

28 beyond a reasonable doubt."  _Jackson v. Virginia_, 443 U.S. 307, 319,

1

1  99 S. Ct. 2781, 2789 (1979)(emphasis in original); <u>United States v.</u>
2  <u>Castaneda</u>, 16 F.3d 1504, 1510-11 (9th Cir. 1994).  In conducting this
3  review, the Court is powerless to question the witnesses'
4  credibility, and must presume that the trier of fact will resolve any
5  conflicting inferences in favor of the prosecution.  <u>United States v.</u>
6  <u>Johnson</u>, 229 F.3d 891, 894 (9th Cir. 2000) (citing <u>United States v.</u>
7  <u>Croft</u>, 124 F.3d 1109, 1125 (9th Cir. 1997) and <u>Wright v. West</u>, 505
8  U.S. 277, 296-97, 112 S. Ct. 2482 (1992) (plurality opinion)).  The
9  reviewing court must permit a jury to "draw reasonable inferences
10 from proven facts" and must assume that the jury would make all
11 inferences which support a guilty verdict.  <u>United States v. Garza</u>,
12 980 F.2d 546, 552 (9th Cir. 1992).

13      The defendant moves for Judgment of Acquittal on three grounds.
14 The court will address each of these grounds in the order presented.

15              A.   <u>FBI Investigation is not an "Official Proceeding"</u>

16          Defendant's first argument is that an FBI investigation is
17 not an "official proceeding" within the meaning of 18 U.S.C. §
18 1515(a).

19          Title 18, United States Code, section 1512(c)(2) states:

20          (c)  Whoever corruptly -

21              (2) otherwise obstructs, influences, or impedes any
                 official proceeding, or attempts to do so, [is guilty
22              of a felony].

23
24      Defendant's argument is that, under 18 U.S.C. § 1512(c)(2), as
   defined in 18 U.S.C. § 1515(a)(1)(C), an FBI investigation is not an
25 "official proceeding".  Section 1515(a)(1)(C) states:
26
27          (a) As used in sections 1512 and 1513 of this title and in
              this section -
28
              (1) the term "official proceeding" means -

                                 2

(C) a proceeding before a Federal Government
agency which is authorized by law.

The defendant cites several cases that support his view,
however, these cases can be distinguished and the court concludes
that an FBI investigation is an "official proceeding" within the
meaning of the statute.

1.   Legislative History

A review of the legislative history of 18 U.S.C. §
1512 reveals that the term "official proceeding" is to be interpreted
broadly, to encompass both criminal investigations and court
proceedings.

Current section 1512,and the use of the term "official
proceeding", has its genesis in the Victim and Witness Protection Act
of 1982 (VWPA).  The 1982 VWPA had as its purpose the strengthening
of existing legal protections for victims and witnesses of federal
crimes.  S.Rep. 97-532; 1982 U.S.C.C.A.N. 2512, 2515.

As noted by the Senate Judiciary Committee:

> The problem of victim and witness intimidation which this
> Title addresses was brought out clearly in two days of
> public hearings held in 1979 by the American Bar
> Association Criminal Justice Section's Victims Committee.
>
> Under current law there is ambiguity about who would
> constitute a "witness".  Generally, court decisions define
> "witness" to mean a person "expected" to testify in a court
> proceeding.  Therefore, it is questionable whether Title 18
> as presently written would protect a witness who is able to
> provide information about a crime *but who is not
> necessarily expected to testify because the testimony would
> either constitute hearsay (often the case with informants),
> would be privileged, or would otherwise be inadmissible.
> The scope of the offense should not be limited by concerns
> about the status of the victim as a person who has
> testified or will be able to testify in court.  Rather, the
> offense should be addressed to punishing the acts of
> intimidating or injuring a person because of his knowledge
> about the commission of a crime.*  Id., at 2521 (emphasis
> added).

3

The Judiciary Committee went on to explain the expansive interpretation that was to be given to the term "official proceeding" under the statute:

> The term "official proceeding" is defined broadly in section 1514 [now current section 1515] where definition is also given to the term "law enforcement officer". Id., at 2523.
>
> *The obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.* In the Committee's view, this observation leads to the conclusion that the purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by simple enumeration of commonly prosecuted obstruction offenses. *There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice.* Some examples of such conduct, actually prosecuted under current residual clauses, which would probably not be covered in this series without a residual offense clause, are as follows:
>
>> (IV) A conspiracy to cover up the Watergate burglary and its aftermath by having the Central Intelligence Agency *seek to interfere with an ongoing FBI investigation of the burglary.*
>
> In order to reach such cases . . . the Committee determined to include subsection (a)(3)[now section (a)(2)]. [T]he analysis should be functional in nature to cover conduct the function of which is to tamper with a witness, victim, or informant in order to frustrate the ends of justice. Id., at 2524 (emphasis added).

The Judiciary Committee further commented on the expansive interpretation to be given to "official proceeding" in addressing that the official proceeding need not be in progress or pending at the time:

> The Committee felt that this increases the scope of the section by expanding the galaxy of witnesses and victims the protections of its language is meant to embrace. Intimidation offenses are particularly insidious and do violence to traditional notions of justice because no one can be convicted of a crime which is not reported. *Subsection (d)(1), among other things, specifically reaches*

4

1
2
*intimidation offenses committed before a crime is reported to the appropriate authorities.* Id., at 2525 (emphasis added).

3    Title 18, United States Code, section 1513 is entitled

4  "Retaliating Against a Witness, Victim or Informant".  It utilizes

5  the same definition of "official proceeding" used under section 1512.

6  In addressing amendments to section 1513 that would broaden

7  protections of victims and witnesses of crimes, the Senate Judiciary

8  Committee considering the 1982 VWPA noted that "current law does not

9  clearly proscribe retaliation against friends, relatives, or

10  associates of an individual *who has provided information concerning*

11  *criminal investigations.*  Id., at 2526.

12    In further addressing the definition of "official proceeding"

13  contained in sections 1512 and 1513, the Committee stated as follows:

14
15
16
17
18
19
20
21
The Committee has also substituted the term "official proceeding", which is defined in section 1514 [now 1515] for the current law term "legal proceedings".  This change is in no way intended to limit the reach of the current language.  In particular, the Committee intends that the statute remain applicable in civil and administrative proceedings, where warranted, as well as criminal proceedings.  The term "official proceeding" is intended to achieve this result.  In addition the word "involved" is used instead of the more limited word "instituted" to make it clear that relocation is possible *prior to formal charges being brought* against a specific defendant.  *The definition of "official proceeding" would indicate the same result.*  Id., at 2530 (emphasis added).

22    In 1997, the House Judiciary Committee considered H.R. 2181 -

23  The Witness Protection and Interstate Relocation Act of 1997.  In

24  addressing the background and the need for the legislation, the

25  Committee noted that prosecutors and police confront two principal

26  types of witness intimidation - overt and implicit.  1997 WL 583228,

27  *2.  The Committee sought to strengthen protections for victims and

28  witnesses of crimes so as to increase cooperation during criminal

investigations.  Id.  Toward that end, the Committee added subsection
(j) to section 1512, which established enhanced penalties for
obstruction of justice offenses involving victims, witnesses, and
informants by adding a conspiracy component to obstruction of justice
under section 1512.  Insofar that "official proceeding" was the
definition applicable to section 1512, this is a further indication
of legislative intent that an "official proceeding" encompass a
criminal investigation.

Therefore, the legislative history behind section 1512 and the
definition of "official proceeding" reveals that it was to be given
an expansive reading in order to effectuate the intent behind the
statute - to protect victims, witnesses and others from threats and
intimidation during criminal investigations and prosecutions.

2.   An FBI Investigation is an "Official Proceeding"

The current version of Section 1512(c)(2) became
effective July 30, 2002, as part of the Sarbanes-Oxley Act of 2002.
See, Pub.L.No. 107-204, 116 Stat. 745 (2002).  Section 1512(c) was
one of the measured responses by Congress to improve the accuracy and
reliability of corporate disclosures by penalizing those who obstruct
justice by somehow impairing the integrity or availability of
records, documents, and other tangible objects.  Id.  Section
1512(c)(1) lists specific conduct that is prohibited under this
subsection, while 1512(c)(2) is intended to account for unenumerated
conduct that violates the subsection.  Evidence of the expansive
nature of the term is the precedential authority that defined
"official proceeding" in section 1512 prior to the 2002 amendments.
See,  S.Rep. 97-532; 1982 U.S.C.C.A.N. 2512; United States v.
Gonzalez, 922 F.2d 1044, 1055-56 (2d Cir. 1991); United States v.

6

1   Kelley, 36 F.3d 1118, 1128 (D.C. Cir. 1994). Although the text of

2   section 1512 changed due to the 2002 amendments, there is no

3   indication that Congress intended to alter or change the judicial or

4   past legislative interpretation of "official proceeding". Central

5   Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511

6   U.S. 164, 185 (1994)("When Congress reenacts statutory language that

7   has been given a consistent judicial construction, we often adhere to

8   that construction in interpreting the reenacted statutory

9   language.").

10      Section 1512(g)(1) states that "no state of mind need be proved

11  with respect to the circumstance that *the official proceeding . . .*

12  *before a government agency is before . . . a_Federal government*

13  *agency*, and section 1512(g)(2) states that "no state of mind need be

14  proved that the . . . *law enforcement officer is an officer or*

15  *employee of the Federal government*." Thus, section 1512 specifically

16  contemplates criminal law enforcement investigations, utilizing law

17  enforcement officers, in addition to more formal court and grand jury

18  proceedings.

19      "Official proceeding" is broadly defined as including

20  investigatory proceedings by government agencies to effectuate

21  Congress' purpose in passing it. United States v. Gonzalez, 922 F.2d

22  at 1055 (2d Cir. 1991), cert. denied, 502 U.S. 1014 (1991). Contrary

23  to defendant's argument, the Second Circuit in Gonzalez addressed the

24  definition of "official proceeding" as referred to in section

25  1512(a)(1)(A)(whose definition is contained in the same section at

26  issue in this case - section 1515(a)), and held that the term

27  "official proceeding" applies to those acts which occur during the

28  investigatory stage. Id., at 1055-56. In so doing, the Second

7

Circuit stated that it read the term "official proceeding" broadly in order to effect Congress' intent on passing it, and thus applied the term to an agency criminal investigation.  Id.

The defendant cites United States v. Dunn, 434 F.Supp.2d 1203 (M.D. Ga. 2006), a district court case which held that an ATF investigation, standing alone, is not an "official proceeding" under the obstruction of justice statute.  Id., at 1209.  However, the court did note that Dunn would be guilty of obstructing justice if a prosecution in federal court was foreseeable.

For a prosecution to be foreseeable, the person must have an inkling that he is the target of an investigation.  Id., at 1210.  In this case, the record is clear that Bob Holloway and defendant Ermoian both knew that he was under federal investigation.  The phone calls themselves reveal Bob Holloway and the defendant lamenting the length of the investigation and the identity of the federal agents.

The defendant also cites United States v. Gabriel, 125 F.3d 89, 105 fn.13 (2d Cir. 1997)("the jury also reasonably could have concluded that Gabriel's sole intent was to interfere with the FBI investigation, and if the jury had so concluded, it would have been compelled to find Gabriel innocent.").  This language was dicta contained in a footnote, and the issue was not specifically addressed by the court.  Indeed, the court did not even cite to its earlier opinion in Gonzalez, discussed above, which held that "official proceeding" applies to acts committed during the investigation phase.

The defendant states that United States v. Kelley, 36 F.3d 1118 (D.C. Cir. 1994), cited by the government in an earlier brief, is actually helpful to him because its finding that the U.S. Agency for International Development (AID) had subpoena powers and the power to

administer oaths, thus lending an air of formality that supported a
finding that processes before it were "proceedings" under section
1505.  However, that determination was made by the court in light of
its finding that there was a "proceeding" under section 1505.

When specifically addressing the issue of whether the
investigation by AID was an "official proceeding" under section 1512,
the District of Columbia circuit held that it was, without qualifying
that it reached its conclusion because of AID's subpoena powers and
its powers to administer oaths.  Id., at 1128.[1]

Under defendant's interpretation of Kelley, the coverage of
section 1512 would turn on an inquiry into an agency's own
regulations concerning the use of its subpoena powers.  There is no
reason to believe that Congress intended to require such an agency-
by-agency inquiry, particularly in light of the legislative history
of the statute.

Nonetheless, even within the restrictive definition of Kelley,
as an arm of the DOJ, an FBI criminal investigation is an  "official
proceeding" under section 1512.

---

[1]  Even so, the FBI is not an independent agency, but a subpart
of the Department of Justice (DOJ).  28 C.F.R. § 0.01.  The DOJ,
pursuant to 18 U.S.C. § 6004, has the power to issue orders compelling
the production of testimony and information in matters within the
cognizance of the Criminal Division.  28 C.F.R. § 0.175(a).  The FBI
does have subpoena power delegated from the Attorney General equal to
that of the DEA.  See, 18 U.S.C. § 3486 and Attorney General Order #
2718-2004; 28 C.F.R. §§ 0.85 and 0.104.

1    The defendant also cites United States v. Ramos, 537 F.3d 439
2    (5th Cir. 2008), in support of his position that an FBI investigation
3    is not an "official proceeding" under section 1512.  Ramos involved
4    an internal Border Patrol investigation, and the court held that
5    Congress did not intend to "criminalize an omission that interferes
6    with a preliminary, routine, intra-departmental inquiry of the type
7    here."  Id., at 464.  The investigation at issue in this case was not
8    a "preliminary, routine, intra-departmental inquiry", but a full
9    criminal investigation.  Furthermore, the court noted that it
10   specifically did not address whether an agency investigation could
11   ever constitute an "official proceeding" under section 1512, and
12   limited its holding to the specific facts before it.  Id., at fn. 18.

13   The defendant distinguishes United States v. Cross, 258
14   F.Supp.2d 432 (E.D.Va. 2003), claiming that the "official proceeding"
15   at issue was the federal grand jury or criminal case proceedings, not
16   the preceding DEA investigation.  However, this interpretation is in
17   direct conflict with the language of the case.

18   As stated in Cross, the government argued that it was the
19   federal investigation of a co-defendant, which was underway prior to
20   the assault on the victim, which satisfied the criteria for federal
21   jurisdiction under section 1512.  Id., at 433.  The court agreed,
22   concluding "that Agent Parker interviewed Lewis on July 12, 2002,
23   prior to the alleged assault of Lewis by Cross on August 10, 2002,
24   and that a DEA investigation against Goodman was underway at the time
25   of the assault."  Id., at 435 (emphasis added).  "Therefore, as Lewis
26   was a witness in a federal investigation, which led to federal
27   charges, the criteria are met for the charge of witness tampering
28   under 18 U.S.C. § 1512(b)(1)."  Id. (emphasis added).

10

The defendant also distinguishes <u>United States v. Plaskett</u>, 2008 WL 3833838 (D. Virgin Islands)(unpublished), <u>aff'd on other grounds</u>, 355 Fed.Appx. 639 (3rd Cir. Virgin Islands).  In <u>Plaskett</u>, the district court directly addressed the issue of "official proceeding" in the body of its opinion:

> Viewed in the light most favorable to the government, the evidence also shows that Plaskett knew at the time of those meetings that a federal investigation and grand jury proceeding were likely forthcoming.  A rational jury could find beyond a reasonable doubt that Plaskett knowingly attempted to corruptly impede or obstruct an official proceeding in December, 2004, and in January, 2005.

<u>Id</u>., at *5.  Footnote 2 to the <u>Plaskett</u> decision further illuminates the issue, i.e., "[T]o the extent Plaskett argues that the federal agency investigation does not constitute an official proceeding under Section 1512(c)(2), the Court is unpersuaded.  Indeed, the plain language of the statute forecloses Plaskett's interpretation."

A case with facts similar to those in the instant case is <u>United States v. Townsend</u>, __F.3d ___, 2011 WL 102765 (11th Cir. 2011).  In <u>Townsend</u>, the defendant, a corrections officer, was aware of a joint Miami-Dade Police Department/DEA investigation into a co-conspirator's marijuana enterprise, and she spoke to her co-conspirator on the phone just before search warrants were executed to warn him that search warrants were about to be executed on his home and grow-houses.  In light of this conduct, the defendant was charged with obstruction of justice, pursuant to 1512(c)(2), along with other crimes.

The Eleventh Circuit held that there was sufficient evidence from which the jury could find that the defendant obstructed justice by impeding an official proceeding - the DEA/Miami-Dade Police narcotics investigation.  Implicit in its holding, then, was its

11

conclusion that sufficient evidence existed that a reasonable jury could find beyond a reasonable doubt that the narcotics investigation was an official proceeding.  Id.

For the foregoing reasons, the FBI investigation at issue is an "official proceeding" under section 1512(c)(2), and defendant's argument must fail.

B.   The Defendant Acted "Corruptly"

The defendant's next argument is that the evidence was insufficient for any rational juror to find beyond a reasonable doubt that the defendant "corruptly" obstructed the FBI's investigation.

As the jury was instructed, to act "corruptly" meant to act for a knowingly wrongful or evil purpose.  Jury Instruction No. 20.

At 8:48 a.m. on September 20, 2007, co-defendant Dave Swanson, an officer with the Stanislaus County Sheriff's Department, called the defendant and told him that law enforcement had been at Holloway's "Burn-Out Party" taking pictures; to tell Bob Holloway to "watch his back", and that there may be search warrants about to be executed by law enforcement at Holloway's business - Road Dog Cycle (RDC).

At 9:13 a.m., the defendant called Holloway and told him he had received a call from his "source" (Swanson); that law enforcement had been taking pictures at a gathering at RDC, and that Holloway needed to "watch his back".  He further informed Holloway that the information came from "someone in the court system" and that law enforcement may be trying to "get orders from the judge."  Gov't Ex. 3a-1.  Notably, the defendant told Holloway that "actually there's something may be going on right at this moment, so you may take a look around the shop to see if you see anything, so, alright"?  Id.

12

1   A jury could reasonably have concluded that this comment was the

2   defendant's attempt at telling Holloway to get rid of any

3   incriminating or illegal evidence at RDC.

4        This interpretation is supported by the fact that the very next

5   call made by Holloway was to his son, Brent Holloway, at 9:26 a.m.

6   that morning.  During that call, Holloway asked Brent whether they

7   had anything "questionable" at the shop, at which time they  had a

8   conversation about an FXR frame and whether it was safely stored in

9   the alley behind RDC.  Gov't Ex. 3c-1.

10       Later that day, at 12:41 p.m., Holloway called the defendant to

11  compare notes about the information Holloway received directly from

12  defendant Steve Johnson and what the defendant received from his

13  "source" in the courthouse - Dave Swanson.  They spoke of possible

14  law enforcement action being contemplated against Holloway.  One hour

15  later, Holloway called the defendant as the defendant was going to

16  his office to tell him that he was circling RDC to make sure "they're

17  not assembling the troops."  Gov't Ex. 3f-1.

18       The next significant conversation involved the defendant, along

19  with Steve Johnson, calling Holloway from the defendant's office at

20  1:22 p.m.  Gov't Ex. 3h-1.  During this conversation, Steve Johnson

21  relayed to the defendant, to relay to Holloway, the description of

22  what Johnson believed to be law enforcement surveillance vehicles

23  near RDC at the time.  Id.

24       The defendant and Holloway next talked at 1:51 p.m., wherein

25  they evaluated and weighed the credibility of the information the

26  defendant received versus the information Holloway received from

27  Johnson, and both concluded that the information the defendant

28  received from his "law enforcement source" was reliable.  Gov't Ex.

13

3i-1.

The next day, September 21, 2007, the defendant and Holloway had another phone conversation at 11:46 a.m.  Again, they compared the reliability and credibility of their respective sources, and the defendant stressed that his source (Swanson) is "legit" and when they (Holloway and Ermoian) talk, "you'll know why."  Gov't Ex. 4a-1. Five days later, the defendant described Swanson as "someone I could trust", whereupon Holloway agreed that he is "a good guy - one of the good old boys".  Gov't Ex. 5a-1.

Notably, throughout all of these conversations, the defendant never once mentions the name of his source on the telephone; indeed, he specifically told Holloway that "when you and I get together I'll tell you where I got the information from and you'll understand." Gov't Ex. 3e-1.  The jury could have found that this secrecy is necessitated because the defendant knew he had received the information from a corrupt law enforcement source, and that the information was about a pending or contemplated law enforcement action.  This, combined with defendant's instruction to Holloway to destroy or hide evidence in contemplation of an anticipated search warrant (and defendant's knowledge that Holloway would follow his instructions), is sufficient for the trier of fact to find corrupt intent on the part of the defendant.

        C.   Multiple Conspiracies

The defendant next argues that he is entitled to a judgment of acquittal because the government proved either multiple conspiracies or one different than that charged.

"The issue of whether a single conspiracy has been proved is a question of the sufficiency of the evidence."  United States v.

14

1  Duran, 189 F.3d 1071, 1078 (9th Cir. 1999).  "There is sufficient

2  evidence to support a conviction if, viewing the evidence in the

3  light most favorable to the prosecution, any rational trier of fact

4  could have found the essential elements of the crime beyond a

5  reasonable doubt." Id.; see also Jackson v. Virginia, 443 U.S. 307,

6  319 (1979).  "In order to establish sufficient evidence, 'the

7  prosecution need not affirmatively rule out every hypothesis except

8  that of guilt.'" Schell v. Witek, 218 F.3d 1017, 1023 (9th Cir. 2000)

9  (citing Wright v. West, 505 U.S. 277, 296 (1992)) (plurality

10 opinion).

11      The defendant asserts that, because there were separate

12 occurrences that were proved at trial, i.e., the "Swanson"

13 information and the "Johnson" information, there were separate

14 conspiracies rather than the one conspiracy alleged in Count 16.  The

15 defendant further argues that since co-defendant Swanson was

16 acquitted, the jury must have convicted defendant Ermoian and co-

17 defendant Johnson based on the "second" separate conspiracy involving

18 the information given to Ermoian by co-defendant Johnson.

19      "A conspiracy is an agreement to accomplish an illegal

20 objective, coupled with one or more overt acts in furtherance of the

21 illegal purpose and the requisite intent necessary to commit the

22 underlying offense." United States v. Bibbero, 749 F.2d 581, 587

23 (9th Cir. 1984).  The test for whether a single conspiracy existed,

24 as opposed to multiple conspiracies "is whether there was one overall

25 agreement to perform various functions to achieve the objectives of

26 the conspiracy." Id.  The evidence must show that each of the

27 defendants was involved.  Id.  A formal agreement is not necessary

28 and a single conspiracy may involve several subagreements or

15

subgroups of conspirators.  Id.  "[T]he joinder [of a conspiracy] by a new member does not create a new conspiracy, does not change the status of the other conspirators... a withdrawal [of a member] neither creates a new conspiracy, nor changes the status of the remaining members."  Marino v. United States, 91 F.2d 691, 696 (9th Cir. 1937).  "A single overall agreement need not be manifested by continuous activity.  There may be a suspension of activities which does not divide a single conspiracy into more than one."  United States v. Little, 753 F.2d 1420, 1448 (9th Cir. 1984).

A factors analysis is used to distinguish single from multiple conspiracies.  Bibbero, 749 F.2d at 587, citing United States v. Tille, 729 F.2d 615, 621 (9th Cir. 1984).  "The relevant factors include the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals."  Id.  There is no requirement that every member of the conspiracy know every other member nor be aware of all acts committed in furtherance of the conspiracy.  United States v. Taren-Palma, 997 F.2d 525, 530 (9th Cir. 1993), overruled on other grounds, United States v. Shabani, 513 U.S. 10 (1994).  "The evidence need not exclude every hypothesis other than a single conspiracy exists."  United States v. Patterson, 819 F.2d 1495, 1502 (9th Cir. 1987).

"A variance occurs when the proof introduced at trial differs materially from the facts alleged in the indictment."  United States v. Antonakeas, 255 F.3d 714, 722 (9th Cir. 2001).  A variance is reversible error only if it has affected substantial rights and is not fatal unless defendant Ermoian could not have anticipated from the indictment what evidence would be presented at trial.  United

16

1 States v. Antonakeas, Id., quoting, 3 Wright, Federal Practice and
2 Procedure, Criminal §516 (2d ed. 1982).

3     Prejudice may arise in three ways:  (1) inadequate opportunity
4 to prepare a defense and exposure to unanticipated evidence at trial;
5 (2) deprivation of the right to be tried only on charges presented in
6 an indictment returned by a grand jury; and (3) exposure to
7 prejudicial spill-over.  United States v. Morse, 785 F.2d 771, 775
8 (9th Cir. 1986).  Variance is not prejudicial if the indictment is
9 sufficiently explicit to inform defendant Ermoian of the charges
10 against him.  United States v. LeMaux, 994 F.2d 684, 690 (9th Cir.
11 1993).

12     The evidence at trial was sufficient for a jury to find a single
13 conspiracy whereby co-defendant Bob Holloway was provided information
14 from various sources, including co-defendant Swanson and co-defendant
15 Johnson, all funneled though defendant Ermoian, for the purpose of
16 corruptly frustrating and impeding the investigation into Road Dog
17 Cycle conducted by the FBI.

18     Numerous calls took place between Holloway and defendant
19 Ermoian, as well as Holloway and co-defendant Johnson, where
20 information was passed on and its importance discussed as well as
21 what course of action to take in light of the information.  In fact,
22 at one point, co-defendant Johnson was in defendant Ermoian's office
23 when this information was being passed to Bob Holloway.  Gov't Exh
24 3h-1a.  The trier of fact could reasonably have determined there was
25 an agreement between the parties to pass on the information gathered
26 to Bob Holloway, often using defendant Ermoian as a conduit, so
27 Holloway could do whatever needed to be done to take counter measures
28 and corruptly impede the investigation that was taking place.

1       The conspiracy involved the same general scheme, the same key

2  actors, the same methods of accomplishing the transaction, and the

3  same objective.   Thus, the evidence was sufficient to establish one

4  conspiracy consisting of one overall agreement between defendant

5  Ermoian, and co-defendants Johnson and Bob Holloway to collect and

6  disseminate information to corruptly impede the investigation that

7  was taking place.

8                         II.

9                MOTION FOR NEW TRIAL

10    A district court's power to grant a motion for new trial is much

11  broader than its power to grant a motion for judgment of acquittal.

12  United States v. Alston, 974 F.2d 1206, 1210 (9th Cir. 1992).

13      The defendant moves for a new trial based on five specific

14  reasons.   The court will address each of the reasons below.

15         1.   FBI Investigation Is Not An "Official Proceeding"

16        This argument is addressed above and will not be repeated

17  here.   The court adopts its findings and conclusions regarding this

18  issue reached in its analysis of this issue in response to

19  defendant's Motion for Judgment of Acquittal.

20         2.   Jury Instructions

21        The defendant argues that the jury instructions were

22  incomplete because the court did not instruct the jury that "the

23  providing of lawful, bona fide, legal representation services in

24  connection with or anticipation of an official proceeding" was a

25  defense to obstruction of justice count.   18 U.S.C. § 1515(c).[2]

26  _____

27      [2]   Section 1515(c) states: "This chapter does not prohibit or

28  punish the providing of lawful, bona fide, legal representation

Section 1515(c) has be held to provide a complete defense to obstruction of justice. United States v. Kellington, 217 F.3d 1084, 1098 (9th Cir. 2000).

When there is no request for a particular jury instruction, the Ninth Circuit reviews only for plain error. United States v. Bear, 439 F.3d 565, 568 (9th Cir. 2006); United States v. Monzon-Valenzuela, 186 F.3d 1181, 1183 (9th Cir. 1999).

To reverse a conviction under this standard, there must be (1) error, (2) that is "plain", and (3) that affects substantial rights. Johnson v. United States, 520 U.S. 461, 466-67 (1997).  If these conditions are met, the court may exercise its discretion to reverse, but "only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 467.

Assuming, arguendo, that the failure to instruct on the defense of lawful representation under section 1515(c) was error, and such error was "plain", the error did not affect Ermoian's substantial rights.  The defendant was permitted to present testimony, including expert testimony, and fully argued this defense throughout the trial. Counsel's entire closing argument consisted mainly of the defense of lawful representation and that the defendant had no "corrupt" intent.

Furthermore, any such instruction under section 1515(c) was adequately covered in other instructions.  A trial court is not required to give a particular instruction regarding the defense's theory of the case so long as the court's instructions adequately cover the subject. United States v. Sayakhom, 186 F.3d 928, 940 (9th

services in connection with or anticipation of an official proceeding."

19

1    Cir. 1999), <u>United States v. Zuniga</u>, 6 F.3d 569, 571 (9th Cir. 1993).

2    In this case, the instructions adequately covered the mental state

3    required by the defendant that is addressed under section 1515(c).

4         The jury instruction for Obstruction of Justice was as follows:

20

The object of the alleged conspiracy as set forth in Count Sixteen is to Obstruct Justice, under United States law.

> The elements of the crime of Obstruction of Justice are:
>
> First, that a defendant knowingly;
>
> Second, corruptly obstructed, corruptly influenced, or corruptly impeded, or attempted to do so;
>
> Third, an official proceeding.

Jury Instruction No. 18 (emphasis added).  Jury Instruction No. 19 defined "knowingly" as follows:

> An act is done knowingly if a defendant is aware of the act and does not act through ignorance, mistake or accident. The government is not required to prove that a defendant knew that his acts were unlawful.  You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether a defendant acted knowingly.

Finally, Jury Instruction No. 20 defined "corruptly" as follows:

> The term "corruptly" means to act for a knowingly wrongful or evil purpose in wrongfully obstructing, influencing or impeding an official proceeding.

When compared to the defense set forth in section 1515(c), it is apparent that the jury instructions adequately covered the defense theory, i.e., that the defendant had no "corrupt" intent in relaying information to Bob Holloway and that he was acting in his capacity as a bona fide, lawful legal representative of Mr. Holloway.

Defendant relies on United States v. Kellington to state that the lack of such instruction requires reversal of his conviction.  In Kellington, not only did the court fail to give a 1515(c) instruction, but the trial court affirmatively thwarted defendant's counsel's attempts to present a defense based on legal, bona fide representation by instructing the jury that the defendant's experts' testimony on the ethical obligations of the defendant was "merely

21

background", and further prevented defense counsel from arguing the importance of such testimony at closing argument. <u>Kellington</u>, <u>supra</u>, at 1100-1101.

In this case, counsel was given every opportunity to argue and present evidence on his bona fide legal representation defense. No effort was made by the government or the court to thwart such a defense. Thus, any error did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings", and the defendant's argument must fail.

The defendant also makes a corollary argument that his failure to request a jury instruction under section 1515(c) was ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Counsel cannot argue ineffective assistance of counsel as part of a motion of new trial, but such claims can be raised as part of a habeas corpus petition. <u>United States v. Ross</u>, 206 F.3d 896, 900 (9th Cir. 2000); <u>United States v. Hanoum</u>, 33 F.3d 1128, 1131 (9th Cir. 1994).

### 3.   Evidence Preponderates Against a Guilty Verdict

The court adopts its findings and conclusions set forth under its analysis of multiple conspiracies contained in its decision on defendant's Motion for Judgment of Acquittal.

### 4.   Testimony of Rocky Pipkin

Defendant argues that the government presented false, misleading, and legally erroneous testimony by investigator Rocky Pipkin that contributed to the verdict.

A conviction obtained using knowingly perjured testimony violates due process. <u>Jackson v. Brown</u>, 513 F.3d 1057, 1071 (9th Cir. 2008). This prohibition against the use of false testimony

applies even when the testimony in question was relevant only to the witness's credibility.  Napue v. Illinois, 360 U.S. 264, 269 (1959). Even if the government unwittingly presents false evidence, a defendant is entitled to a new trial if there is reasonable probability that without the evidence the result of the proceeding would have been different.  United States. v. Young, 17 F.3d 1201, 1204 (9th Cir. 1994).

In this case, there is no showing, and the defendant does not argue, that the government knowingly used perjured testimony, nor has there been a showing that the government, even unwittingly, presented false evidence regarding the testimony of Mr. Pipkin.

The defendant cites specific examples of what he claims are "false" testimony of Mr. Pipkin.  Each of the examples the defendant cites are not evidence of false testimony, but are an expert's opinion evidence.

First, the defendant claimed Mr. Pipkin falsely testified that it was improper for an investigator to obtain any information from a confidential law enforcement source.  Testimony of Rocky Pipkin, 8/6/10, RT at 11.  Mr. Pipkin is correct on his interpretation of the law on this issue.  When asked why it was not proper for an investigator to obtain any information from a confidential law enforcement source, Mr. Pipkin stated as follows:

> Q.   All right.  Was that proper to do so?
>
> A.   No.
>
> Q.   Why not?
>
> A.   Well, law enforcement investigations are confidential, and no private investigator or private citizen has the right or authority to obtain that information.  RT at 11, lines 10-15.

1    Mr. Pipkin is correct on his interpretation of the law.   Law

2    enforcement investigations are confidential, and no one outside law

3    enforcement should have access to confidential law enforcement

4    investigations.

5    The defendant takes issue with Mr. Pipkin's testimony that it is

6    improper for any private investigator to pass on confidential law

7    enforcement information to a client that he knows to be a target of

8    the investigation.   RT at 12.   However, Mr. Pipkin elaborated on this

9    opinion during cross-examination by defendant's counsel:

10        Q.   Would you agree that it is not improper for an
11             investigator to inform a client that he may be under
             investigation?

12        A.   It depends on where you get the information.

13        Q.   Okay.  And it is not necessarily improper to discuss
             search warrants or subpoenas so that an appropriate
14             investigations could be conducted or other lawful
             actions taken to prepare a defense; do you agree with
15             that?

16        A.   No.

17        Q.   Why not?

18        A.   In - *it doesn't specifically address the issue in this
             case.   The problem I have with that is the information*
19             *that was provided to Mr. Holloway was from a source*
             *within law enforcement that should not have released*
20             *the information, firstly.  And then, secondly, it*
             *should not have been disseminated to the target of*
21             *that criminal investigation, which was confidential at*
             *the time.  No charges had been filed.*   RT 41, lines 4-
22             22 (emphasis added).

23                              *   *   *

24        Q.   And an investigator can investigate a case before
             charges are filed, right?
25
26        A.   Absolutely.  But the problem that I have with this is
             the fact that when you - when you are relaying
             information that is confidential in nature, *you are*
27             *then assisting the individual or the target in*
             *obstructing justice because they are going to know*
28             *about the investigation and possible search warrants*

24

*and ultimately what is going to result from that.*
*They are going to try to remove evidence, hide*
*evidence, and that is, you know, thwarting the*
*investigation.*

Q.   Well, ultimately, *it depends on the intent of the*
*investigator and the attorney in providing that*
*information to their client; is that correct?*

A.   *That is correct.*

Q.   An you could take confidential information that an
investigation is coming, and here's the things we need
to do in order to defend ourselves, to defend the
client against the investigation?

A.   *Again, I have a problem with that, because in this*
*particular case, the information was ultimately*
*disseminated to the target of the investigation.  And*
*based on my reading of the transcripts, he acted on*
*that information and he acted unlawfully.*  RT 42,
lines 5-23.

This testimony of Mr. Pipkin was not false.

The defendant's next argument that Mr. Pipkin falsely testified
concerns his testimony that an investigator cannot talk to a grand
jury witness except as an investigator for the attorney who
represents the witness.  RT at 33.

The entire testimony of Mr. Pipkin on this issue is contained on
pages 32 and 33 of the transcript.  During that testimony, Mr. Pipkin
admits that he has very little experience with Grand Jury
proceedings.  RT 32, lines 11-13.  Mr. Pipkin was then asked the
following:

Q.   Right.  And so the Grand Jury witness can talk about
his testimony to attorneys and investigators, right?

A.   I believe his attorney.  I'm not - you know, I can't
go as far as saying that anyone else can talk to them.

Q.   *So you don't know whether a witness who appeared*
*before the Grand Jury is able to talk to anyone else*
*about the testimony; you just don't have any knowledge*
*or expertise in that area?*

A.   *That is correct.*  RT at 33, lines 13-21 (emphasis

25

1      added).

2          Therefore, Mr. Pipkin did not testify falsely.  He admitted that

3  he didn't know whether a witness was free to talk to others about

4  his/her Grand Jury testimony.

5          Next, the defendant argues that Mr. Pipkin testified falsely

6  that it would be improper for an investigator to receive unsolicited

7  confidential information from a source.  Mr. Pipkin explained his

8  answer by repeatedly stating that it all depends on what kind of

9  information the source is trying to give him.  RT at 36, lines 13-23.

10  He further explained that, if the information is obvious on its face

11  that it is confidential information, he would end the conversation

12  quickly.  RT at 37, lines 4-9.  He readily admits that one hasn't

13  committed a crime by receiving such information, but a private

14  investigator could open himself up to liability.  Id., lines 10-14.

15  He further explains that there is no code section or law that

16  prohibits an investigator from receiving such information, but it was

17  his opinion that it was a common sense situation.  RT at 38, lines 1-

18  8.

19          Therefore, there was no false testimony by Mr. Pipkin on this

20  issue.  He explained that his opinion was his own personal opinion,

21  that it was not supported by a code section or case law, but he felt

22  that it was a common sense approach in order to avoid civil and

23  criminal liability on the part of the investigator.

24          Finally, the defendant argues that Mr. Pipkin testified falsely

25  regarding his presence at an investigator's conference in Burlingame

26  on June 12-13, 2009.  The jury was free to believe or disbelieve Mr.

27  Pipkin's testimony on this issue, particularly in light of his

28  explanatory rebuttal testimony.

1    In evaluating Mr. Pipkin's testimony, the jury was given the

2  standard Ninth Circuit instructions concerning expert witnesses:

3         You have heard testimony from persons, who, because of
          education or experience, are permitted to state opinions
4         and the reasons for their opinions.

5         Opinion testimony should be judged just like any other
          testimony.  You may accept it or reject it, and give it as
6         much weight as you think it deserves, considering the
          witness's education and experience, the reasons given for
7         the opinion, and all the other evidence in the case.

8  Jury Instruction No. 13.

9    The jury was also given the standard Ninth Circuit jury

10 instruction addressing the credibility of witnesses, which told the

11 jury that they were "free to believe everything a witness says, or

12 part of it, or none of it".  Jury Instruction No. 9.

13   The defense called its own expert, Mr. David Queen, to rebut Mr.

14 Pipkin's opinions.  The jury could have concluded that Mr. Queen

15 agreed with the essential elements of Mr. Pipkin's testimony (and the

16 government's theory of the case), i.e., that the leaking of

17 confidential law enforcement information from a private investigator

18 to his client depends on the relationship between the private

19 investigator and his client, and whether the investigator believes

20 the client will act improperly on that information.

21   This convergence between Mr. Pipkin's testimony and Mr. Queen's

22 testimony was brought out by defense counsel on cross-examination of

23 Mr. Pipkin:

24        Q.   And an investigator can investigate a case before
               charges are filed, right?
25
          A.   Absolutely.  But the problem that I have with this is
26             the fact that when you - when you are relaying
               information that is confidential in nature, you are
27             then assisting the individual or the target in
               obstructing justice because they are going to know
28             about the investigation and possible search warrants

and ultimately that is going to result from that. *They are going to try to remove evidence, hide evidence, and that is, you know, thwarting the investigation.*

Q.   Well, ultimately, *it depends on the intent of the investigator and the attorney in providing that information to their client; is that correct?*

A.   *That's correct.*  RT at 42, lines 1-14 (emphasis added).

Similarly, Mr. Queen admitted that a private investigator cannot disseminate confidential law enforcement information to his client if he believes his client may be intending on committing an offense based on that information:

A.   And the part of the problem with your hypotheticals is you have to understand the relationship between the private investigator and the client. *Because if a private investigator has reason to believe that his client is planning to commit an offense using the information, that's separate and distinct from communicating evidence, whether it is to a client or a lawyer, unless there is reason to believe the contrary* . . .  Testimony of David Queen, 8/10/10 RT at 54, lines 4-11 (emphasis added).

* * *

Q.   And also it depends on the relationship between the two of them and the history of the relationship?

A.   *It would be the information the private investigator would have -*

Q.   *About his client?*

A.   *- about his client and about all the factual circumstances.*  RT at 56, lines 9-15 (emphasis added).

Mr. Queen never listened to the calls in this case, nor did he speak to the defendant about the nature of his relationship to Bob Holloway or have any knowledge of the nature of the relationship between the defendant and Bob Holloway.  RT 55, lines 7-13; 56, lines 23-25.

The jury was free to weigh any contradictory evidence given by

28

the experts in this case, however, at the same time, the jury could

also consider what key evidence the experts agreed upon.  <u>See</u>,

<u>Fountila v. Carter</u>, 571 F.2d 487, 490 (9th Cir. 1978).  What the

expert witnesses agreed on in this case was consistent with the

government's theory of the case - that it was the nature of the

relationship between the defendant and Mr. Holloway that is key, and

the passing on of confidential law enforcement information by the

defendant to Mr. Holloway, while instructing Mr. Holloway to "look

around his shop" to get rid of evidence, was evidence of the corrupt

intent of the defendant.

### 5.   Testimony of Kirk McAllister

A criminal defendant is not entitled to compel the

government to grant immunity to a witness.  <u>United States v.</u>

<u>Westerdahl</u>, 945 F.2d 1083, 1086, (9th Cir. 1991) <u>citing</u> <u>United States</u>

<u>v. Shirley</u>, 884 F.2d 1130, 1133 (9th Cir. 1989).  An exception to

this rule is where the fact-finding process is intentionally

distorted by prosecutorial misconduct, and the defendant is thereby

denied a fair trial.  <u>Westerdahl</u>, 945 F.2d, at 1086, <u>citing</u> <u>United</u>

<u>States v. Lord</u>, 711 F.2d 887, 892 (9th Cir. 1983).

The court stated in <u>United States v. Duran</u>, 189 F.3d at 1071:

> Immunity is an executive, not a judicial function,
> and [t]his court has emphatically rejected the
> argument that the sixth amendment provides a
> defendant with a right to demand use immunity for
> defense witnesses who invoke their privilege
> against self-incrimination. An exception to this
> rule exists, however, where the prosecutor
> intentionally distorts the fact-finding process.
> The fact finding process is intentionally
> distorted where the prosecutor intentionally
> causes the witness to invoke the Fifth Amendment
> privilege, or "grant[s] immunity to a witness in
> order to obtain his testimony, while denying
> immunity to a defense witness whose testimony
> would directly contradict that of the government

1    witness.

2  Id. at 1087 (citations omitted).

3       First, there was no motion or request made by defendant Ermoian

4  to immunize McAllister.

5       Second, the government did nothing to cause McAllister to invoke

6  his Fifth Amendment rights.

7       Third, none of the witnesses testified on behalf of the

8  government under a grant of immunity, thus there is no inference of

9  prosecutorial misconduct by not granting immunity to McAllister.

10      Fourth, the assertions that McAllister would have corroborated

11 that defendant Ermoian had no corrupt intent are not supported.  The

12 court strikes the letter written by McAllister to Ermoian.  Def.

13 Motion Exh. 8.  The letter is not under penalty of perjury and it is

14 irrelevant in that it is dated 6 years, 8 months prior to the events

15 in question.  There is nothing in the letter, dated January 25, 2001,

16 to confirm that McAllister would have testified that defendant

17 Ermoian was working at his direction as an investigator for Holloway

18 with respect to the recorded calls in question.  Nor is there

19 anything in the Declarations of Bob and Brent Holloway that would

20 confirm the same.  Those Declarations merely state what their

21 perceptions were concerning Ermoian's work as it related to the

22 representation of Bob Holloway and Road Dog Cycle.

23      The proposed testimony of McAllister does not directly

24 contradict the government's evidence such that it would meet the test

25 necessary to compel the government to grant immunity because there

26 was no intentional distortion by the government.  In fact, as stated

27 above, the defense expert, David Queen, and the government's expert,

28 Rocky Pipkin, agreed that it was the nature of the relationship

30

between the defendant and Mr. Holloway that is key, and the passing on of confidential law enforcement information by the defendant to Mr. Holloway, while instructing Mr. Holloway to "look around his shop" to get rid of evidence, was evidence of the corrupt intent of the defendant.

The court notes a recorded call that was placed by Bob Holloway to McAllister at 9:31 a.m. - 18 minutes after defendant Ermoian called Holloway to tell him about the information he had received from Swanson regarding the Burn Out party and the potential search warrant.  During the call at 9:31 a.m., Holloway asks McAllister if he had talked to Gary (defendant Ermoian) and *McAllister tells him that he had not, that he had just got in*.  This shows that defendant Ermoian did not make the initial call to Holloway at McAllister's direction, contrary to defendant Ermoian's apparent assertions in this motion.   There was sufficient evidence before the jury that Bob Holloway was seeking legal advice from Kirk McAllister concerning the leaked information, as counsel for the defendant advocated to the jury.  Defendant Ermoian moved into evidence two telephone calls where Bob Holloway spoke about meeting with McAllister, presumably regarding the information passed on by defendant Ermoian and co-defendant Johnson.  Def. Ermoian Exh. DE-1(b) and DE-2(b).  McAllister called Holloway on 9/21/2007 at 8:38 a.m. - nearly a full day after the information from Swanson and Johnson was received by Holloway and Ermoian - and arranged for Holloway to come to his (McAllister's) office at 3:00 p.m. that day.  Def. Ermoian Exh. DE-1(b).  Later that day, at 2:42 p.m., Holloway called his wife and told her that he was meeting with McAllister.  Def. Ermoian Exh. DE-1(b).

31

1    The defendant is unable to show prosecutorial misconduct and

2    there is nothing to show that defendant Ermoian did not receive a

3    fair trial.

4                                    III.

5                                CONCLUSION

6        For all the foregoing reasons and all reasons stated in

7    open court in the oral rulings on these motions:

8        Defendant's Motion for Judgment of Acquittal is DENIED.

9        Defendant's Motion for New Trial is DENIED.

10

11       SO ORDERED.

12

13       Dated: March 30, 2011.

14

15                                  ___/s/ Oliver W. Wanger___
                                       Oliver W. Wanger
16                                     U.S. District Judge

17

18

19

20

21

22

23

24

25

26

27

28

                                     32